# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 20, 2011

## STATE OF TENNESSEE v. GEORGE EUGENE CODY

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-260     Seth Norman, Judge**

---

**No. M2010-02121-CCA-R3-CD - Filed September 27, 2011**

---

A Davidson County Criminal Court jury convicted the defendant, George Eugene Cody, of two counts of criminally negligent homicide, *see* T.C.A. § 39-13-210 (2006), two counts of first degree murder committed in the perpetration of a robbery, *see id.* § 39-13-202(a)(2), two counts of especially aggravated robbery, *see id.* § 39-13-403, and two counts of identity theft, *see id.* § 39-14-150.  At sentencing, the trial court merged the criminally negligent homicide convictions into the felony murder convictions and imposed a total effective sentence of life plus 20 years' imprisonment.  On appeal, the defendant challenges only the sufficiency of the evidence to support his convictions.  Discerning no infirmity in the evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, George Eugene Cody.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Sarah N. Davis and Robert Elliott McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Davidson County grand jury charged the defendant with two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated robbery, two counts of identity theft, and five counts of forgery involving the August 26, 2008 shootings of Pierre Robert Colas, a Vanderbilt University professor, and his

sister, Marie Catherine Colas,[1] and the subsequent use of Doctor Colas' credit card within days of the shooting. Hans Peter Colas, the victims' father, testified that the victims were born in Germany. His 32-year-old son, Pierre Robert, was an assistant professor of anthropology at Vanderbilt University who had recently purchased his first home. The second victim, Mr. Colas' 27-year-old daughter, was a resident of Zurich, Switzerland where she taught music. She was visiting her older brother in summer 2008 when they were both shot in her brother's home. Doctor Colas died instantly from a single gunshot wound to his head. Ms. Colas, who also suffered a single gunshot wound to her head, succumbed to her injuries several days later on August 31, 2008.

Doctor Sergio Romero, an assistant professor of anthropology at Vanderbilt University, worked with Doctor Colas. He recalled that Doctor Colas joined the faculty of the university in January 2007 and purchased a home on McFerrin Avenue about one year later. During summer 2008, Doctor Romero moved in with Doctor Colas and rented an attic area of the house. Doctor Romero recalled that Doctor Colas did not have curtains or blinds on his windows because "he believed that . . . if there was basically nothing blocking the view from the outside, then people could see that there was nothing of value inside." According to Doctor Romero, Doctor Colas also grew up in an area of Germany where "security was never a big concern," so Doctor Colas regularly left the doors unlocked. Doctor Colas' sister visited in mid-August 2008, and the siblings vacationed in North Carolina during her visit.

On August 26, 2008, Doctor Romero attended a faculty meeting, which Doctor Colas did not attend because he took his visiting sister shopping instead. When Doctor Romero arrived home at approximately 8:00 that evening, Ms. Colas greeted him at the door and showed him some new cowboy boots she had purchased that day. Doctor Colas was working at his desk. Both Colas siblings were fully-clothed when Doctor Romero went upstairs to his apartment to watch television, shutting the attic door behind him.

Within 15 to 20 minutes of going upstairs, Doctor Romero "started to hear some voices and steps . . . downstairs." He described the voices as "muffled." Within a few minutes, Doctor Romero "heard [Doctor Colas] scream, [']Marie[']. And a second after that, [Doctor Romero] heard Marie scream, [']Please['], and at that point [Doctor Romero] heard a shot." As soon as he "realized that something was happening downstairs," Doctor Romero went to the attic door to ensure it was closed. He "began shaking in fear" as he telephoned 9-1-1. The 9-1-1 dispatcher stayed on the telephone with Doctor Romero and instructed him

---

[1] The indictment alleges the victim's name as "Marie Catherine." The transcript reflects that her father testified that her name was "Mary Christine." Exhibits at trial of the victim's identification, however, reflect that her name was "Marie Christine."

to stay upstairs until the police arrived. Telephone records showed Doctor Romero telephoned 9-1-1 at 9:14 p.m.

When the police arrived, they initially handcuffed Doctor Romero until they could determine he was not involved in the shootings. When Doctor Romero went downstairs, he did not see Doctor Colas. He did, however, see Ms. Colas lying on the floor "naked except for her underpants" with "blood streaming down her left side." Doctor Romero recalled that Ms. Colas was "wailing." He said that he "had never seen anyone like that, alive but not alive, it was horrible." He testified, "Every voice I heard was muffled, I couldn't tell who it was . . . Except for the wailing I heard when Marie was screaming." Doctor Romero had never met the defendant, had never seen him around the victims, and testified that the defendant had no reason to be in the home.

Officer Shane Fairbanks of the Metropolitan-Nashville Police Department (MPD) responded to the call of a shooting at the victim's address. He arrived on the scene at 9:30 p.m. and immediately observed "two people down inside." Because the officers had "got[ten] there quick," they proceeded to clear the house first to ensure the perpetrators were not still inside the home. After clearing the main floor, the officers discovered the door leading upstairs to the attic apartment. There they discovered Doctor Romero, who was very upset and still talking on the telephone with the 9-1-1 dispatcher.

Downstairs, the officers discovered the victims lying on the floor near the door to the attic. Officer Fairbanks recalled that "the male victim was farther to the left and into the room and his legs came out where I could see, and the female victim was across his legs." The female victim was still moving and "moaning." Officer Fairbanks determined that the female victim had been shot in the head because that was "where it seemed like most of the blood was" located. He was unsure whether the male victim was still alive when they arrived. He described the home as "just an awful scene."

MPD Identification Unit Officer Charles Linville arrived at the scene at approximately 10:20 p.m. to process the crime scene for evidence. When he arrived, Doctor Colas was the only victim present; Ms. Colas had been transported to the hospital already. Officer Linville recalled a "large amount" of blood at the scene. He found a spent shell casing near Doctor Colas' shoulder. He also observed blood stains on the wall and a bullet fragment near the victim's body. He collected latex gloves found in the laundry room near the back door, suspecting that they may have been used in the shooting. Officer Linville also collected fingerprints from areas in the home where things appeared "out of place." He testified, however, that none of the fingerprints recovered from the scene, other than those belonging to the victims, were sufficient for comparison.

MPD Detective Ben Ward, one of five to seven detectives assigned to the case, discovered on August 27 that several purchases had been made at a local WalMart with Doctor Colas' credit cards. Detective Ward received surveillance video and receipts showing that a "vehicle of interest" entered the parking lot at 12:14 a.m. on August 27 and that three men entered the store approximately eight minutes later. One of the men, later identified as Thomas Reed, purchased clothing, shoes, and a Play Station video game system at 12:42 a.m. Other purchases occurred at a nearby Walgreens, several gas stations, and a different WalMart. On August 28, Detective Ward briefed patrol officers at the "midnight roll call," the shift beginning at 10:30 p.m., regarding descriptions of the men in the surveillance videotape and the vehicle they were seen driving.

MPD Officer Kenneth Bray worked the midnight shift on August 28 and was present for Detective Ward's briefing. He recalled that Detective Ward informed the officers to be on the lookout for two young white males and one middle-aged black male who were seen in a gold Buick Regal. Early on the morning of August 29, Officer Bray found a vehicle matching the description and "ran the tag." He learned the vehicle was registered to an older white male. Rather than investigating further, he decided to prepare a report on the vehicle's location.

While he filled out the form, the defendant came out onto the front porch of a nearby home. The defendant approached Officer Bray's vehicle. Officer Bray quickly hid the photograph of the defendant taken from the WalMart surveillance video and told the defendant that he was in the area investigating the report of some burglaries. Soon thereafter, another officer arrived, and the defendant turned to talk to that officer. As the two spoke, Officer Bray motioned to the other officer indicating that the defendant was the person in the surveillance video. The officers asked the defendant to provide his identification, so the defendant went inside his home to retrieve it. While the defendant was inside, the officers decided that they should "stop" the defendant upon his return and call the detectives.

When the defendant returned to his porch, the officers approached the front yard of the home. The defendant told them to stay off his property. The officers informed the defendant that he was being detained until the detectives could arrive. Officer Bray recalled that at that point the defendant "became very nervous, very aggressive . . . [and] he started cussing [the officers] and telling us how he doesn't like police, how much he doesn't trust the police."

The defendant told the officers that there were only two people in the home – a black male and the defendant's girlfriend (a white female). When the defendant's girlfriend brought his cigarettes out on the porch, however, the officers saw two white males pretending to be asleep on couches in the living room. The men had blankets pulled up high

to their faces. Fearing that the men might be armed, Officer Bray "pulled his weapon" and ordered everyone to stand up. The officers handcuffed the men and brought one to the porch while the other man stayed inside on the couch. During the detention, the defendant "had some sort of panic attack."

On cross-examination, Officer Bray testified that he knew the men were suspects in the credit card use, but he was unsure whether they were involved in the shooting deaths. Regarding the defendant's demeanor, he stated, "I have worked around a lot of people that are not nervous around the police." He acknowledged, however, that the defendant was not the first nervous person he had encountered and that getting "cussed" was a "daily occurrence" in his job. Officer Bray denied telling the defendant that he would lose his children if he was uncooperative. He also said that he would have admonished any other officer who he had heard make such a threat.

Thomas Reed, a 22-year-old traveling magazine salesman at the time of the offenses, testified that he was charged with theft and forgery for his involvement in the case. He recalled that he had arrived in Nashville "a couple of days before this happened" as part of his employment with a door-to-door magazine sales company. He worked with Michael Shane Holloway,[2] who was acquainted with the defendant through Mr. Holloway's mother. Mr. Reed explained that the employees stayed at a local motel and were transported to neighborhoods each day where they walked door-to-door selling magazines.

On August 26, 2008, the defendant telephoned Mr. Holloway on Mr. Reed's cellular telephone. Mr. Reed recalled that they spoke with the defendant some time after 10:00 p.m. because the salesmen had just finished a nightly business meeting. The defendant told the men that he had some credit cards that they "could go use and get some free stuff." The defendant picked up Mr. Reed and Mr. Holloway at approximately 10:30 p.m., and the men went to the defendant's home. Mr. Reed recalled that another black male, about 25 to 30 years old with short hair, was with them. At the defendant's home, the men discussed that Mr. Reed resembled "the guy on the card" and decided that Mr. Reed should make the purchases. The defendant's girlfriend gave the credit cards to Mr. Reed.

The defendant drove Mr. Reed and Mr. Holloway to WalMart where Mr. Reed had "no trouble at all" buying clothing and shoes with Doctor Colas' credit card. They also purchased a Play Station, which was sold to purchase crack cocaine. Mr. Reed said he never asked where the credit cards came from because he just wanted to buy drugs. After stopping at several other stores, the men returned to the defendant's home.

---

[2] Mr. Holloway was also charged with offenses related to the use of the victim's credit cards. His case was abated, however, due to his death.

Mr. Reed stayed at the home while the defendant and Mr. Holloway left to sell the video game system and purchase drugs. While he waited for Mr. Holloway and the defendant's return, the defendant's girlfriend showed him credit cards belonging to a female and discussed transferring funds from the accounts via a laptop computer. Mr. Holloway and the defendant returned with the crack cocaine, so Mr. Reed made no attempt to access funds from the other credit cards. The defendant returned Mr. Reed and Mr. Holloway to their motel at approximately 4:00 a.m. Mr. Reed testified that he was arrested the following morning at the motel. He assumed he was being arrested for using the credit cards, but he soon realized he was a suspect in a murder investigation. He first learned of the shooting deaths from the police; the defendant never told him the source of the credit cards.

James Christopher McWhorter testified that, at the time of trial, he was incarcerated in a Kentucky federal prison and awaiting sentencing on convictions involving identity theft and the use of false identification documents. From September through November 2008, however, he was housed in the Davidson County Criminal Justice Center where he shared a cell with James Ward, a man through whom Mr. McWhorter became acquainted with the defendant. Mr. McWhorter described himself as a jailhouse lawyer, so the defendant confided in him regarding his case.

According to Mr. McWhorter, the defendant admitted that "his wife . . . 'Little Bro' [and himself] were going to rob a place, and they went out . . . [and] ended up not doing it." The defendant told Mr. McWhorter that the trio saw a couple walking down the street and decided to rob them instead. They pulled a gun and forced the man and woman into their house. "Little Bro" got angry when neither victim had any money, so he ordered the woman "to get naked" so that he could determine if she wore any jewelry. The man told "Little Bro" that there was a safe in the back room. From the front of the house, the defendant heard arguing. The defendant saw "Little Bro" push the woman and, when the man went toward "Little Bro," "Little Bro" shot them both. After the shootings, the defendant "went to get high" at Nathaniel Carson's home where he hid the guns in the front porch column underneath a concrete cap. Somehow, the weapons were moved to the defendant's home where they were later recovered by the police through a search of the defendant's residence. The defendant told Mr. McWhorter that he expected Mr. Carson to retrieve the guns and hide them again. According to the defendant, Mr. Carson came by his home when the police were already there and was unable to retrieve them.

The defendant told Mr. McWhorter that he was carrying a gun that did not function properly because "he had absolutely no intention whatsoever of killing anybody." The defendant asked Mr. McWhorter if the defendant's involvement constituted felony murder. When Mr. McWhorter told the defendant, "Absolutely," the defendant became angry and told Mr. McWhorter that he did not know what he was talking about and that the

defendant "was going to be able to beat" the charges.

On cross-examination, Mr. McWhorter admitted that he sent a letter to the MPD relating the defendant's statements in hope of some benefit, but he realized that any recommendation the State made would not be binding upon his pending federal charges. He stated, "Obviously, I do want to get some type of benefit out of doing this . . . but at the same time it really is the right thing to do." He said that all the information he recounted in the letter to the police came from the defendant, not the media.

Mr. McWhorter also testified that he initially did not want to be involved in this case because he did not want to be thought of as a "snitch." Mr. McWhorter said that he was moved from Davidson County to Kentucky for his safety and that he hoped his report would not "filter up to Kentucky." He also said that he waited to write the letter to the police until he could corroborate the defendant's statements through conversations with Mr. Carson. Byron Grizzle authenticated jail housing documents that confirmed Mr. McWhorter, Mr. Carson, and the defendant were housed in the same pod in fall 2008.

MPD Detective Matthew Filter was the lead detective on the investigation of the shooting deaths. Detective Filter executed a search warrant of the defendant's home and recovered two weapons there. He also determined that Mr. Reed and Mr. Holloway were at the motel when the shootings occurred. Through Mr. McWhorter's letter, Detective Filter learned of the "hollowed-out" porch pillars at Mr. Carson's home. Detective Filter testified that many details contained in Mr. McWhorter's letter were not known to the media. Specifically, no details had ever been released concerning the discovery of a non-functional gun at the defendant's home, the hiding place in Mr. Carson's porch pillars, and Ms. Colas' being found wearing only her underwear.

Detective Filter recalled that the defendant claimed he was at home when the shootings occurred but added that the defendant lived "just a mere couple of blocks away" from the victim's home. Detective Filter testified that someone could walk "very easily" from the victim's home to the defendant's home in "five minutes or so" because the homes were located "just about two blocks" apart. Likewise, Mr. Carson's home was located only one block from and within view of the defendant's home. Detective Filter recalled that eight to 10 police cars were at the defendant's home on August 29 and that even if the cars could not be seen from Mr. Carson's home, the blue lights from the police vehicles would have been easily observed. Telephone records showed calls between Mr. Carson and the defendant on August 29 consistent with statements concerning the defendant's attempts to have Mr. Carson retrieve the weapons from the defendant's home. Detective Filter acknowledged that no tape recordings were made of calls to confirm the participants or nature of any conversations. He also testified that officers secured the home immediately

upon the defendant's arrest while waiting on the issuance of the search warrant.

MPD Sergeant Mickey Yentes assisted in the search of the defendant's home on August 29. He described the defendant's bedroom as "in complete disarray." He discovered several garbage bags located in a six-inch space between the defendant's bed and the wall. Inside the garbage bags, Sergeant Yentes found a brown striped polo-style shirt identical to the one worn by the middle-aged black male seen in the WalMart surveillance video. He also found a white envelope containing identification cards and credit cards belonging to the victims. Sergeant Yentes recalled that a black male, who seemed "curiously interested" in the activity at the defendant's home, loitered near the home during the search of the residence.

MPD Identification Division Officer Rhonda Jo Evans assisted in documenting evidence taken during the search of the defendant's home. In addition to the striped shirt, identification cards, and credit cards, Officer Evans noted that a "white powder" and "green leafy substance" were removed from the home. Officers discovered a .22 revolver with a gauze-wrapped handle inside a baby bassinet. The revolver contained two bullets. They also found a semi-automatic pistol hidden inside a sock and shoe on the defendant's back porch. The pistol contained seven .380 hollow point bullets.

Doctor Amy McMaster, Davidson County medical examiner, testified as an expert in forensic pathology. She performed the autopsy on Doctor Colas and determined that he died from a gunshot wound to his head. She said that the bullet entered on the right side and came to rest on the left side of his skull where it was recovered. Doctor McMaster opined that Doctor Colas died instantly from his wound and characterized the bullet's damage as "non-survivable."

Doctor McMaster reviewed the autopsy report of Ms. Colas prepared by a former colleague. Ms. Colas died five days after suffering a single gunshot wound to her head. The bullet entered on the left side of her head and split into three pieces. The pathologist recovered two bullet fragments from the right side of Ms. Colas' skull, and one fragment exited the right side of her head. Doctor McMaster opined that it was "very unlikely that [Ms. Colas] would have been able to recover from her injuries" and that any survival would have included "severe neurologic impairment." Doctor McMaster observed no defensive injuries on either victim.

Tennessee Bureau of Investigation (TBI) firearms identification expert Shelly Betts reviewed items submitted from the investigation of the shootings. She identified one firearm recovered from the defendant's home as a "low quality German manufactured .22 caliber revolver" that did not function properly. Another weapon found at the defendant's

residence was a ".380 auto caliber semi-automatic pistol manufactured by Cobra Enterprises" that she described as "in good working order." Agent Betts's examination revealed that the bullet recovered from Doctor Colas' head was fired from the Cobra pistol.

TBI Agent Chad Johnson, an expert in forensic serology, examined both handguns recovered from the defendant's home and confirmed the presence of the defendant's DNA on both weapons. Agent Johnson's testing revealed the presence of the defendant's DNA on one of the gloves recovered at the crime scene. The same glove also contained DNA from Doctor Colas. Agent Johnson acknowledged that it was impossible to determine how the latex gloves had been worn in order to ascertain how the DNA was transferred to the gloves. Likewise, he acknowledged that the defendant's DNA could have been transferred to the weapons by skin cells of the defendant's that came into contact with the items and that the presence of the defendant's DNA did not necessarily mean the defendant had handled the weapons.

The defendant presented the testimony of Michael L. Pyburn, a former MPD officer currently employed as a private investigator, who testified that the defendant's home was not visible from Mr. Carson's home. He acknowledged, however, that the presence of police cars' "blue lights" would have been visible from Mr. Carson's porch.

The defendant testified that he did not know the victims, was not present when they were shot, and did not know who killed them. He claimed his only involvement was to use the victims' credit cards without knowing that the victims had been killed. The defendant claimed that he and a co-defendant, Lavonta Churchwell, did not have a very good relationship and that he considered Mr. Churchwell a "rather loud mouth obnoxious person." He testified that Mr. Churchwell and Mr. Carson were cousins by marriage.

The defendant testified that Mr. Carson telephoned him on the evening of August 26 while he was sleeping, so the defendant did not answer the telephone. He said that his stepson took a message and told Mr. Carson that the defendant was asleep. Ten minutes later, Mr. Carson showed up at the defendant's door and told him about the credit cards. The two men then enlisted Mr. Holloway and Mr. Reed to assist them in using the credit cards. The defendant stated that Mr. Carson was the other black male in the car when he went to the motel to pick up Mr. Holloway and Mr. Reed.

The defendant denied speaking to Mr. Churchwell. He denied hiding the pistol in his shoe in the backyard and explained that his shoes had been outside for several weeks because his backyard was muddy. The defendant explained that he used latex gloves in his cleaning business and regularly kept them in his vehicle, which was usually unlocked.

On cross-examination, the defendant testified that he never profited from the use of the credit cards, although he did admit his involvement in their use. He explained that in his statement to the police he identified the victims' shooter by a nickname, "Man Man," because he did not want to be known as a "snitch." He admitted that Mr. Carson's nickname was "Man Man." Likewise, the defendant told the police that someone nicknamed "Slash," a nickname of Mr. Churchwell, was also involved in the shootings. The defendant maintained at trial that the weapons had been "planted" at his home and that the glove was possibly removed from his unlocked car and accidentally left at the scene by the actual perpetrators. He denied all involvement in the robberies and shootings. He also explained that he was in the midst of a "rather heavy" crack cocaine addiction in August 2008 and that he needed money to support his addiction.

Based upon this evidence, the jury convicted the defendant of the criminally negligent homicides of both victims, as lesser included offenses of premeditated first degree murder. The jury also convicted the defendant of two counts of felony murder, two counts of especially aggravated robbery, and two counts of identity theft. The jury acquitted the defendant of forgery. At sentencing, the trial court merged the criminally negligent homicide convictions into the felony murder convictions and imposed an effective sentence of life plus 20 years' incarceration. On appeal, the defendant challenges the sufficiency of the evidence to support his convictions.

Initially, the State asks this court to dismiss the defendant's appeal due to his failure to file a timely notice of appeal. The State correctly notes that the notice of appeal was filed on November 8, 2010, almost four months after the entry of judgments on July 16, 2010; the defendant did not file a motion for new trial in this case. *See* Tenn. R. App. P. 4(a) ("[T]he notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the entry of the judgment appealed from."). The State argues that the defendant failed to seek a waiver of the timely filing and that the interest of justice does not require this court to waive the timely filing requirement. *See* Tenn. R. App. P. 4(a) ("in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice"). This court's record, however, reveals that on October 12, 2010, the defendant did in fact file a motion with this court requesting this court to accept a late-filed notice of appeal. On November 4, 2010, this court granted the defendant's request to accept a late-filed notice of appeal, ruling that the interest of justice required us to do so. Accordingly, this court has previously ruled that the defendant's appeal should proceed.[3]

---

[3] We further note that the defendant's October 12, 2010 motion and this court's November 4, 2010 order granting the late-filing were both served on the State. Nevertheless, for the second time in as many
(continued...)

Turning now to the defendant's claim that the evidence is insufficient to support his convictions, we review this claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Tennessee Code Annotated defines first degree murder, as is applicable in this case, as "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2).

The Code defines criminally negligent homicide as "criminally negligent conduct that results in death." *Id*. § 39-13-212(a). Criminal negligence is defined as acting "with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur . . . [and] [t]he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id*. § 39-11-302(d).

"Especially aggravated robbery is robbery . . . (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." *Id*. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by

---

[3](...continued)
months, this court is addressing a dismissal argument raised in the State's brief that has already been disposed of by pre-brief pleadings in this court. *See also State v. Carl J. Wagner*, No. M2010-00992-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Nashville, July 20, 2011).

violence or putting the person in fear." *Id.* § 39-13-401.

A person commits identity theft who "knowingly obtains, possesses, buys, or uses, the personal identifying information of another." *Id*. § 39-14-150(b).

The evidence in this case showed that the defendant and another man entered the victims' home, brandished weapons, and demanded money. The defendant admitted to Mr. McWhorter that he and another man planned the robbery. Likewise, he admitted that he entered the home armed, albeit with a nonfunctional weapon. Nevertheless, the defendant's DNA was found on the pistol that experts determined fired the fatal shots. The defendant told Mr. McWhorter details concerning the offenses that had not been released to the media and were known only to investigators or those involved in the offenses. Doctor Romero's testimony that he heard muffled voices, a struggle, and the victims' screams just prior to the shootings is consistent with the statements made by the defendant to Mr. McWhorter. The defendant admitted at trial that he solicited the aid of Mr. Reed and Mr. Holloway to use Doctor Colas' identification and credit card to make purchases. Mr. Reed testified to unrealized plans made with the defendant and the defendant's girlfriend concerning using the credit cards to transfer funds. A search of the defendant's home uncovered the handgun used in the shootings and the victims' identifications and credit cards. The evidence in this case is sufficient to support the defendant's convictions.

The defendant also argues that "this jury clearly did not understand the jury charge or failed to follow it" as it relates to the court's instructions on criminal responsibility and asks this court to find plain error. The defendant failed to preserve this issue in a motion for new trial and, likewise, failed to cite any authority in support of this argument. Accordingly, it is waived. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by the argument, citation to authorities, or appropriate references to the record will be treated as waived."). In the sense that this is a separate attack on the sufficiency of the evidence, we further conclude that the evidence sufficiently established that the defendant, either alone or as a participant criminally responsible for another's actions, committed the convicted offenses.

*Conclusion*

The evidence is sufficient to support the defendant's convictions of two counts each of felony murder, criminally negligent homicide, especially aggravated robbery, and identity theft. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE